**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| vs. | : | NO. 07-0040-02 |
| | : | |
| **CONCETTA M. JACKSON** | : | |

## M E M O R A N D U M

**STENGEL, J.**                                                                                          September 5, 2013

On July 24, 2008, a federal grand jury issued a superseding indictment charging defendants John Worman, Concetta Jackson, and Dorothy Prawdzik with fifty-five counts of the use of a minor to produce visual depictions of sexually explicit conduct in violation of 18 U.S.C. § 2251(a), and one count of possession of child pornography in violation of 18 U.S.C. § 2252(a)(4). Specifically, Defendant Jackson was charged in thirty of those counts.

On September 2, 2008, Defendant Jackson pleaded guilty to Count 46 of the superseding indictment pursuant to a written plea agreement with the government. Upon the government's motion, I dismissed the remaining counts against her at sentencing. As part of this agreement, Miss Jackson waived her rights to appeal or present a collateral challenge to her sentence. On September 9, 2009, I imposed a sentence of 300 months' imprisonment.[1] One of the conditions of the sentence was that Miss Jackson be

---

[1] The defendant's Offense Level of 45 combined with her Criminal History Category of I yielded a sentencing guideline range of life imprisonment. That range was limited, however, by the statutory maximum of 360 months' incarceration. The defendant's sentence of 300 months was less than the guideline range and less than the statutory maximum.

prohibited from having any contact with the victims of her offense, specifically her four children.

Notwithstanding the waiver of her rights, Miss Jackson appealed her sentence on October 2, 2009. On May 27, 2010, the Court of Appeals for the Third Circuit dismissed the appeal upon granting the government's Motion to Enforce the Appellate Waiver and for Summary Affirmance. Miss Jackson then filed a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255, which I denied based on her waiver. The Third Circuit later denied her request to file a second or successive § 2255 motion on June 3, 2013. Miss Jackson has now filed two separate motions asking that I vacate the condition of her sentencing which prohibits contact with her children. For the following reasons, I will deny these motions.

The nauseating facts of this case are well-known to the parties. In February 2006, detectives from the Delaware County District Attorney's Office executed search warrants at the home that Co-Defendant Worman shared with his mother in Colwyn, and at the home he shared with Defendant Jackson in Collingdale, Pennsylvania. The police seized numerous computers, hard drives, DVD's, CD's, Polaroid pictures and VHS tapes that had been hidden throughout both of the houses and in Mr. Worman's vehicle. A subsequent forensics examination of the evidence revealed 1.2 million images stored on the computers and hard drives, including hundreds of video clips and images that depict at least four minors as they used the bathroom, undressed, and showered at the Collingdale house he shared with Miss Jackson. Investigators learned that Mr. Worman

had installed a video camera in the bathroom wall of that home, and that Miss Jackson permitted him to film the children in exchange for him paying the rent on the house.

The investigation also revealed that Miss Jackson advertised her babysitting services, and took in children that she babysat in her home. She then permitted Mr. Worman to take the female infants upstairs to their bedroom, outside of her supervision. Investigators found images of Mr. Worman having sexual contact with these infants, one as young as three months, saved to Mr. Worman's computers. Miss Jackson admitted to the police that she had turned supervision of the female infants that had been entrusted to her care over to Mr. Worman. This was done at a time when she was well aware of Mr. Worman's involvement with children and with the taping of the other four minors in this case.

Miss Jackson now asks that the prohibition on contact with her children be lifted so "she can write, or send pictures, and she can receive mail, pictures from her children, someday have visits with her children, or talk on phone with her children." She claims that her "Sixth Amendment right to effective assistance of counsel was violated because the sentencing judge had no legal authority to prevent her from contacting her children." She insists that her attorneys should have challenged that illegal sentence, and their failure to do so violated her constitutional rights.

Initially, I note that Miss Jackson's claim attacking a portion of her sentence would have been more appropriately addressed on appeal or through a motion filed pursuant to § 2255. Both of these avenues for relief, however, have already been utilized by the defendant and denied. The Third Circuit enforced Miss Jackson's waiver of rights

on the basis of her plea agreement with the government which called for the waiver of all rights to appeal or collaterally attack her conviction or sentence. By waiving the right to appeal, a defendant necessarily waives the opportunity to challenge the sentence imposed, regardless of the merits. United States v. Khattak, 273 F.3d 557, 562 (3d Cir. 2001). Adopting the view of other circuits courts, the Third Circuit held:

> A waiver of the right to appeal includes a waiver of the right to appeal difficult or debatable legal issues - indeed, it includes a waiver of the right to appeal blatant error. Waiver would be nearly meaningless if it included only those appeals that border on the frivolous . . . . While it may appear unjust to allow criminal defendants to bargain away meritorious appeals, such is the necessary consequence of a system in which the right to appeal may be freely traded.

Id. (quoting United States v. Howie, 166 F.3d 1166, 1169 (11th Cir. 1999)); see also United States v. Wenger, 58 F.3d 280, 282 (7th Cir.1995) ("Defendants who appeal from sentences following plea agreements always point to unanticipated and unwelcome developments. . . . To say that a waiver of appeal is effective if and only if the defendant lacks grounds . . . is to say that waivers will not be honored.")

Here, Miss Jackson pleaded guilty to and admitted the charge filed against her pursuant to a plea agreement with the government. She was sentenced below the advisory guideline range and the statutory maximum. No significant action was taken at the sentencing hearing which the parties failed to anticipate or address. Further, Miss Jackson bargained away her right to appeal or collaterally attack, and that waiver has been upheld by the Third Circuit. Accordingly, I find that Miss Jackson waived her right

to attack her sentence, and I will deny her requests to lift the prohibition on contact with her children.

In the alternative, even if they were properly before me, Miss Jackson's requests would still fail. As the government points out, it is well-settled that a district court is required to examine the factors enumerated in 18 U.S.C. § 3553(a) and state in open court the reasons for imposing a particular special condition. United States v. Miller, 594 F.3d 172, 184 (3d Cir. 2010). Section 3553(a) also requires parsimony, namely that the "court impose a sentence sufficient but not greater than necessary." Before I imposed the restriction on contact with her children, I detailed my reasons in open court at the hearing:

> The defendant in this case procured victims for John Worman, who's been convicted by a jury, who received a sentence of 120 years. The nature and circumstances of this offense as it relates to this defendant, however, are most serious.
>
> And I think in the defendant's statement today where she expressed her remorse to the victims, to her own children, to the mother of the baby who was victimized, I believe that the defendant understands to a great extent the depth of the seriousness of this -- of this crime, where she failed to protect her own children, and allowed Mr. Worman to film her own teenage children in various stages of -- of dress in the bathroom in the family home, and to -- to install and maintain a camera and to record and store videos of -- of her own children.
>
> And it was not over a period of days or weeks or months. It was over a period of years. And so it was a sustained failure to protect these vulnerable and unknowing and innocent young people.

And this was more, I think, than -- than a negligent or -- or careless act or some kind of recklessness, and a -- a failure to acknowledge a -- a risk. This was active cooperation, systematic cooperation in the taking advantage of and the abuse of these children.

And whether or not, and we'll never know really what Ms. Jackson knew about what was going on at all times, but she certainly knew that John Worman was a predator. She certainly knew that he had wildly deviant proclivities and tendencies, and that he was focusing those wildly deviant tendencies on her own children. Fortunately, for some, it wasn't the level of victimization that took place with others, but it certainly was deep, it was pervasive and it certainly has had a devastating impact, and Mrs. -- Ms. Jackson let this happen.

There's no doubt, when we're talking about the nature and the circumstances of the offense, that the principle player here was John Worman, and most of the offense is his. The defendant was complicit. She did not do many of the acts that John Worman did. She didn't have the intent. She didn't have the -- the sick and deviant approach to other people and children that Worman had. But the level of criminal conduct displayed by John Worman really was staggering, and this defendant is guilty in that context. It's a context that he set up.

But I don't believe that Connie Jackson was surprised to learn about some of the things that John Worman was doing, particularly with this infant. That's simply not credible to me. Given all the other things that -- that Connie Jackson knew about John Worman and about what he was inclined to do and what his tastes were and what his abilities were, I don't think that she was surprised to learn what he was doing with this infant. And she certainly knew and agreed to and acquiesced in the conduct regarding her own children. So the nature and the circumstances of the offense are most serious under all the circumstances of -- of this case.

* * *

> Ms. Jackson pleaded guilty. Ms. Jackson did not actively participate in the filming of these children. She did not actively participate in the sexual abuse of -- of children that was recorded on tape. And she was not as actively complicit with John Worman -- Ms. Jackson was not as actively complicit with John Worman as was Ms. Prawdzik.
>
> But Ms. Jackson provided victims to Mr. Worman. And Ms. Rotella makes a good point that much of this conduct would not have happened but for the actions of -- of Connie Jackson.
>
> She breached the trust in some very, very profound ways. Ms. Jackson and Ms. Prawdzik are very similar in that each breached a duty of loyalty, a duty to protect, and breached a trust that comes with being a parent. And in that way, they are very similar, although carried out that breach of trust in some -- in some different ways.

See N.T. 9/09/09 at 107-110, 114. The prohibition on contact with her victims was more to protect the victims rather than to punish Miss Jackson. At the sentencing, the government read into the record a letter addressed to Miss Jackson from one of her children which demonstrated the devastating impact Miss Jackson's conduct had on her victims:

> "Dear Mom. How you impacted my life. Let's start off with trust. You're supposed to be a mother. Well, news flash, mothers don't do half the shit you did. Mothers love, care and protect their children. You didn't do any of that. You sit there and call yourself a mother, you called your children a paycheck, you stole from me and you messed up my credit. "You let a monster, John Worman, in my house, move in without knowing anything about him. What you know is he was a handyman. You knowingly let John put a camera in the bathroom for exchange for him paying rent in our home, and you also let him rape them babies. What were you thinking? For a matter of fact, you weren't thinking. I have so many questions for you but

7

why should I bother.  You don't know the answers.  You have no clue how it is growing up without a mother.  "Well, good thing I had dad.  Dad has been through hell and back trying to raise us kids, teaching us everything because our so-called mother didn't do anything.  Unlike you, dad put us first. He made sure we had everything and that we were happy before himself.  That's how a parent's supposed to be.  It's pretty sad when you wouldn't even give us $10 to help dad out with food and school supplies, or etc.  I am really hurt, betrayed and really confused.  It's -- it's sad because after I find out everything, I was still there for you.  I must say it is my biggest regret.  You just kept hurting and hurting me.  I have so many problems because of you.  I don't trust, I can't speak in front of large crowds, and I didn't know how to do my homework because you always did it.  You pushed me through school.  I didn't even know to write out checks.  I'm not outgoing because you never pushed me.  All you ever cared about was money.  "You sat there and said you took care of all of us, and that -- all your life and now it's your turn.  How can John, that monster, make anyone happy.  Once you have children, there is no your turn.  They come first always and forever.  And to think I used to feel sorry for you.  Now I don't know why I should.  You never cared about me and my feelings.  "You deserve everything that comes your way.  When you got took off the street and put in custody, I was mixed feelings but more happy.  You know why? Because you pled guilty and you were left on the streets and that wasn't fair.  The day you were taken into custody, I was there.  I couldn't even stay in the same room because looking at you hurt.  And for you to ask the lady next to you why are they here hurt too.  "But you want to know what hurt the most? The look on your face.  The look of I don't care, no remorse.  Then I knew you never cared.  That's when I gave up trying to forgive you and John or anything more.  I'm starting to move on.  I'm starting a new life, and I'm starting over.  I know you and John can't hurt me anymore.  There's nothing wrong with your brain.  Stop making up stuff, stop faking it.  You knew what you were doing.  And now this whole thing is over.  This is my final and last goodbye, mom."

See N.T. 09/09/09 at 99-101. Apparently, these feelings of betrayal and hurt have not subsided over the years. The government indicated in its response to the motions that the case agent contacted Miss Jackson's children individually as a result of Miss Jackson's request:

> Although the victims are all now over 18 years old, each was visibly upset at just the potential of having contact with their mother again. Each victim unequivocally stated that they did not want to have any contact with Ms. Jackson.

See Document #256 at 7. These victims could conceivably struggle with this betrayal for many more years. Should a time come when one or more of these victims decide that he or she is ready to renew a relationship with Miss Jackson, then he or she may contact the court, and I will reconsider this restriction. As of today, however, there is no basis to modify the condition or to permit the defendant to have contact with the victims. United States v. Albertson, 645 F.3d 191, 200-201 (3d Cir. 2011) (association-with-minors condition adequately supported by record and consistent with goals set forth in 3553(a) for defendant convicted of molesting his step-daughter); United States v. Miller, 594 F.3d at 190. Miss Jackson allowed Co-Defendant Worman to install a video camera in the only bathroom in her home and permitted him to videotape her children every day for two years, knowing that he would use the videotapes - and her children - for his sexual pleasure. As the government noted, Miss Jackson "breached the most sacred bond of trust, that between a mother and her children. And she did so at a time when all of her children were minors and were under her care." See Document #256 at 7.

9

Accordingly, even if these motions were properly before me, I would deny them in their entirety. An appropriate Order follows.